IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 1, 2014

**STATE OF TENNESSEE v. JIMMIE MARTIN**

**Appeal from the Criminal Court for Shelby County**
**No. 07-07973     James M. Lammey, Jr., Judge**

---

**No. W2013-00889-CCA-R3-CD - Filed June 5, 2014**

---

A Shelby County Criminal Court Jury convicted the appellant, Jimmie Martin, of second degree murder, a Class A felony, and the trial court sentenced him to twenty years to be served at 100%. On appeal, the appellant contends that the evidence is insufficient to support the conviction; that the trial court erred by allowing State witnesses to testify about his prior bad acts in violation of Rule 404(b), Tennessee Rules of Evidence; and that the trial court erred by ruling that statements made by the victim were admissible under the excited utterance exception to the hearsay rule. Based upon the record and the parties' briefs, we conclude that the trial court erred by ruling that the victim statements to a police officer qualified as excited utterances. However, we conclude that the error was harmless and affirm the appellant's conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

Barry W. Kuhn (on appeal) and Charles Mitchell, Coleman Garrett, and Gerald Skahan (at trial), Memphis, Tennessee, for the appellant, Jimmie Martin.

Robert E. Cooper, Jr., Attorney General and Reporter; and Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Patience Branham and Sam Winnig, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

This case relates to the death of the appellant's girlfriend, Martha J. Bownes, on January 13, 2007. At trial, James Bownes, the victim's father, testified that the victim served in the military and spent time in Iraq. When she returned to the United States, she began dating the appellant, and they moved into an apartment in Memphis. One Sunday in January 2007, Bownes received a message from the Memphis Police Department (MPD) Homicide Office. Based on the message, Bownes and his wife drove to Memphis and learned the victim was dead.

On cross-examination Bownes testified that he adopted the victim when she was seven years old. He never knew the appellant while the victim was growing up. Bownes said that the victim and the appellant may have lived together for a year but that he never visited them in their apartment.

Tamu Leland, the victim's sister, testified that she and the victim grew up in Batesville, Mississippi. The victim began dating the appellant after she left the military. One day in April 2006, a friend of the victim telephoned Leland's father, James Bownes. Based on the call, Bownes and Leland went to Memphis, where the victim was living with the appellant, to check on the victim. When they arrived at the victim's apartment complex, the victim was standing outside with two police officers. Leland said that the victim was leaning against a pole, that the victim was "flush red looking" and "shaky," and that she went to console the victim. Leland saw that the driver's side window of the victim's car had been shattered, and the victim told Leland that the appellant broke the window when he tried to hit her with a hammer. The victim wanted Bownes and Leland to take her home to Mississippi, and the victim rode back to Batesville with them. During the drive, Leland picked glass out of the victim's hair and saw that the victim had a scratch on her arm and a scratch on her chest. The victim stayed with Leland in Batesville for about one week. Leland said that the appellant kept telephoning the victim and that "[t]hen all of a sudden he just showed up and parked in my front yard." The victim left Leland's home that same day. Leland said she assumed the victim returned to Memphis.

On cross-examination, Leland testified that she was ten years older than the victim. She described the victim as "wonderful" and "a caregiver" but acknowledged that the victim could be strong-minded and opinionated. The victim was living in Batesville when she met the appellant. In April 2006, the victim was living with the appellant in Memphis. Leland did not know exactly when the hammer incident occurred. However, she and Bownes left Batesville soon after Bownes received the call from the victim's friend, and they drove forty-five minutes to Memphis to check on the victim. During the drive, Bownes spoke on a cellular telephone with the appellant. Leland acknowledged that the appellant may have given Bownes directions to the apartment complex. Bownes and Leland also saw the appellant at a gas station and followed him to the apartment complex. Leland said that the

appellant either stayed outside or went into the apartment he shared with the victim. At some point, the police officers went into the apartment with the victim in order for the victim to get her belongings. Leland said that she did not remember if the officers talked to the appellant and that she did not see them arrest him. She said that the victim did not tell her about what had happened until they were driving back to Batesville, and she described the victim's voice as "very shaky." Leland never saw a hammer and never saw the appellant say anything to the victim.

Sergeant John Goad of the MPD testified that on April 15, 2006, the victim came into the police department and told him that she thought "somebody threw a hammer through her window." He said that she had "marks on her where from the day before she was attacked" and that another officer took photographs of her injuries. Sergeant Goad identified three photographs for the jury. He said that the first photograph showed the victim's chest and that he wrote on the photograph "injuries to a chest area due to a fight that took place on April 14th of 2006." He said that a second picture showed injuries to the victim's arm "where she stated that she was grabbed by the arm." He said that the third picture showed the victim's "backside" where she was scratched by breaking glass and that "I think it was from the back window of her car or something." The victim told Sergeant Goad that her boyfriend was responsible for her injuries.

On cross-examination, Sergeant Goad testified that he was a desk officer and only took the victim's report. He said he thought that the victim drove to the police department to make the report and that no one came with her. Defense counsel asked Sergeant Goad if he could remember the victim's demeanor, and Sergeant Goad answered, "Not off the top of my head. I'm sure she was upset if she . . . came to the police station." He did not go to the scene or investigate the case and was not sure when the hammer incident occurred.

Tracie Price testified that she worked with the victim at Imperial Security. She said that the victim talked about the appellant "all the time" and that she saw the appellant drop off the victim at work sometimes. Price said that the victim often put her telephone calls with the appellant on "loud speaker" and that the appellant and the victim were always arguing. One day in October 2006, the victim and Price were at work, and the victim got into an argument with the appellant over the telephone. After the argument, the appellant walked into the building and created a disturbance. Price explained,

> It was a loud commotion. He was banging on the window
> telling her bitch, I need to talk to you right now, I need to talk to
> you. And she was very upset. She was very afraid. She came
> in, knocked on my boss' door and that's when me and my boss
> came out and was asking her what was going on. That's when

-3-

she said her boyfriend was up here and she was afraid to go out to talk to him because he was going to beat her up and she wanted someone to escort him off the premises.

Price testified that the appellant was angry and that she and her boss had an armed dispatcher escort him out of the building. At some point, the victim was fired. The next day, Price learned from the police that the victim had been shot and killed. Price said the appellant later telephoned her and "tried to explain to me that it was an accident." Price said that she did not know why the appellant called her and that she thought his call was unusual. She recorded the call and gave the recording to the police, and the State played the recording for the jury. Price said that two to three months before the shooting, the victim told her that the victim was going to leave the appellant. Price offered to let the victim stay with her.

On cross-examination, Price testified that she did not know why the appellant was upset when he came to Imperial Security in October 2006. However, earlier that day, he and the victim had been arguing. The appellant walked up to the victim's office window and talked to her through the window. Although the door to the victim's office was unlocked, the appellant did not go into the office. In November 2006, Price and her boyfriend, Charles Woods, went to a nightclub with the victim and the appellant. Imperial Security fired the victim sometime in January 2007, and Price acknowledged that the victim was upset about being fired. Price had to telephone the police and have the victim removed from the premises.

On redirect examination, Price testified that the incident in October 2006 lasted ten to fifteen minutes. Price said she did not consider herself to be the appellant's friend. She acknowledged that on the tape recording, the appellant said he was trying to shoot burglars when he accidentally shot the victim.

Charles Woods testified that he worked for Imperial Security as a dispatcher and worked with the victim. One day, Woods was informed that the appellant was causing a disturbance. Woods told the appellant that the appellant had to leave, and the appellant began making threats. Woods said that he finally got the appellant outside and that the appellant continued making threats. Woods said the appellant got into his car and "sped off." Woods described the victim as "[v]ery distraught."

On cross-examination, Woods testified that he thought the incident happened around the first of November 2006. He said he did not report the incident to the police because the appellant did not cause any property damage or physically harm anyone. However, the appellant was "irate" and was "trying to get into that glass." Woods said the appellant could not get into the victim's office because the door was locked.

-4-

Officer Marvin Pender of the MPD's Communications Department testified that a 911 call reporting the victim's shooting was received at 6:28 p.m. on January 13, 2007. The State played a recording of the call for the jury.

Shanté Rudd testified that she and the victim served in the United States Army together and were best friends. When Rudd returned to the United States after serving overseas, she lived at Fort Gordon in Georgia. In August 2006, the victim visited Rudd. While the victim was there, she spoke with the appellant frequently over the telephone. Rudd said that on the second or third day of the victim's visit, the appellant telephoned the victim and became upset because the victim and Rudd were outside. Rudd stated, "I guess he heard a lot of commotion and people around us and he was questioning, you know, where we were, what we were doing, who we were with." Rudd said that the appellant asked to speak with her and that the appellant told her, "[Y]ou need to make sure [the victim] doesn't do anything stupid."

Rudd testified that she and the victim talked on the telephone at least every other day. She said that she last spoke with the victim about 3:30 p.m. on January 13, 2007, and that they were having "just one of our regular conversations." During the conversation, the victim made a comment about a relationship she had had with a man while she was in the military. Rudd said that she heard the appellant start yelling in the background and that

> Martha then was like, you know, why are you tripping, that's something that happened before you, before we even got together. Then it was some more yelling in the background and she responded and was like, are you serious, like you're really mad about this? And then there was some more yelling at the end of that yelling, I heard him say bitch and she was like well I got your bitch. And so there was some more yelling in the background and then she said well, Te', I'm going to call you back, I'm going to handle this bitch. And that's the last thing she said to me.

Rudd said that she heard the victim and the appellant argue often and that their argument on January 13 "[s]eemed like a regular argument."

Rudd testified that she received a call from the victim at 6:18 p.m. on January 13 but that her phone rang only one time. She said that when she answered it, "the line was dead like [the victim] hung up." Rudd telephoned the victim a few times and left a message, but the victim never called her back. About three days later, the victim's sister telephoned Rudd and told her what had happened to the victim. Rudd gave a statement to police on January

16, 2007.

On cross-examination, Rudd testified that she knew the victim about four years. She said she was certain the appellant was the person arguing with the victim on January 13 because the victim told her it was the appellant and because she heard the appellant. She acknowledged that the victim used profanity frequently, that she never visited the victim in Memphis, and that she never met the appellant.

Caroline Farmer testified that in January 2007, she was living in Edgewater Apartments. The appellant lived in an apartment "on the opposite side in the back" with his brother and a woman Mrs. Farmer identified as the victim. On January 13, 2007, a Saturday, Mrs. Farmer and her husband were in and out of their apartment because they were grilling meat for Mrs. Farmer's birthday. Mrs. Farmer said that sometime between 5:00 and 7:00 p.m., she heard "a lot of banging or beating and then I heard something like kicked, like it might have been a door or something kicked in." She stated, "I can't tell was it a wall or door but I know it was some beating and I heard a kick." After the kick, Mrs. Farmer heard one gunshot. The State asked her how close in time the gunshot occurred to the beating/kicking sound, and she answered, "It was right after that." She and her husband went outside and saw the appellant's brother on a cordless telephone. Mrs. Farmer said that she saw the appellant after the police arrived and that he looked "a little upset."

On cross-examination, Mrs. Farmer testified that she had spoken to the appellant prior to January 13 but that she had never had a conversation with him. The appellant's apartment was behind and across the breezeway from Mrs. Farmer's apartment. She said that the apartment walls were thin but that she could not say exactly where the noises came from. She did not hear any unusual noises prior to the banging and kicking.

Eddie Farmer, Caroline Farmer's husband, testified that on the evening of January 13, 2007, he was grilling meat. Between 5:30 p.m. and 6:00 p.m., he went into his bedroom to rest. About ten or fifteen minutes later, Mrs. Farmer woke him and told him that she had heard a gunshot. Mr. Farmer went outside, saw the appellant's brother dial 9-1-1 on a cellular telephone, and heard the appellant's brother say, "I wish they [would] hurry up." The appellant's brother went back into the appellant's apartment, and the appellant came outside, looking for the police or an ambulance. Mr. Farmer said the appellant was "kind of panicked like."

Retired MPD Officer James Fitzpatrick testified that he responded to the shooting. When he arrived, other officers were already on the scene and had detained two men. The victim was lying on the living room floor directly in front of the apartment door. She was on her back, and her arms were at forty-five-degree angles from her body. She was wearing

a shirt, bra, pants, socks, and tennis shoes, and she was frothing at the mouth. The victim had a wound to her upper left chest, and blood was on her chest and face.

Fitzpatrick testified that the apartment had only one exterior door. The door had two locks, a "twist type" lock in the doorknob and a deadbolt lock above the doorknob. Neither lock was functional when Fitzpatrick examined them. He stated that the bolt in the deadbolt lock had been removed and that the faceplate for the lock in the doorknob had been "forced off, kicked in, knocked in or something." The faceplate was on the living room floor near the victim. Fitzpatrick collected the faceplate, a .22-caliber spent shell casing, and a .22-caliber live round from the living room floor. He also collected items from the victim's person and the handgun involved in the shooting.

Fitzpatrick testified that the appellant waived his Miranda rights and gave a statement. In the statement, the appellant said that he and the victim did not argue on January 13. That evening, they ate dinner, and the victim went into the bedroom to watch television. Later, the appellant went into the bedroom to watch television with her. His brother, Chris Martin, was asleep on the living room couch. The appellant and the victim were "messing around" and were about to have sex when they heard a noise. The appellant put on his pants, got his .22-caliber semiautomatic handgun from underneath the bed, and followed the victim out of the bedroom. They walked down the hallway and into the living room. The appellant looked down at his gun and noticed that the safety catch was off. He said that the victim "was always leaving the safety off" and that he was showing her how to turn the safety catch on when the gun "went off." The victim did not fall immediately, and the appellant asked her if she was alright. The victim dropped to her knees and fell over, and the appellant woke his brother. The appellant called 911 and applied pressure to the victim's wound. The appellant told Fitzpatrick that he and the victim had gone into the living room because they heard the door slamming, that they were "just checking to make sure that no one was in the house," and that they were in the living room about twenty seconds before he shot the victim. He stated that he and the victim had taken the deadbolt lock out of the door previously because someone had tried to break into the apartment but that the lock on the doorknob still worked. Fitzpatrick said the appellant was calm during the interview.

Fitzpatrick testified that parts of the appellant's statement were inconsistent with what he observed at the crime scene. For example, Fitzpatrick wondered how the live round got onto the living room floor. He explained that if the live round had been in the chamber of the gun and the appellant had "rack[ed]" the gun to fire it, then the live round would have been ejected. He also noted that the appellant claimed he and the victim were about to have sex but that the victim was fully clothed. Additionally, Fitzpatrick had asked the appellant where the victim was injured, and the appellant had claimed he did not know. However, the appellant later said that he applied direct pressure to her wound. Fitzpatrick noticed that the

appellant had a fresh, deep bite mark on his shoulder, and the appellant claimed the bite occurred during sexual foreplay. Fitzpatrick said, "I thought it was rather odd because he never made mention of it. It had to be discovered by us in the office." Fitzpatrick said he did not see any blood on the appellant's face or on the front of his clothes but saw "something" near his shirt collar.

On cross-examination, Fitzpatrick testified that he did not know if the appellant had seen the bite mark or even knew it was there. He acknowledged that he did not know how the live round ended up on the living room floor or if it came from the appellant's gun. However, the live round and the gun were the same caliber. Fitzpatrick said that, according to the appellant, the damage to the deadbolt occurred prior to January 13. Fitzpatrick noted that the damage to the faceplate, though, was new. Fitzpatrick said the appellant was cooperative, polite, and did not hesitate to answer his questions.

Jason Hopper testified that on January 13, 2007, he was an MPD officer and responded to a shooting call at the Edgewater Apartments. He and his partner were the first officers on the scene. A young African-American female was lying on the living room floor, and a large amount of blood was on her face and shirt. She had a gunshot wound to her upper chest and began foaming at the mouth. Two African-American males were in the room, and one of them, who was the appellant, told Hopper that he accidentally shot his girlfriend. Hopper saw a live round on the floor, and the appellant told Hopper that he fired his gun only one time. Hopper said that based on that statement, "the live round shouldn't have been there." Hopper also saw on the floor a small brass metal plate from the door, a spent shell casing, and a handgun. The appellant told Hopper that the gun was the weapon involved in the shooting. Later at the Homicide Bureau, Hopper saw a bite mark on the back of the appellant's left shoulder and a "hint" of blood on the appellant's shirt over the bite mark.

Retired MPD Officer John Pasley, the coordinator for this case, testified that he learned about the shooting on the morning of January 14, 2007, when he arrived for work at the police department. The next day, Pasley spoke with the appellant, who was being held on a "48-hour hold." After the 48-hour time period expired, Pasley released the appellant from custody but continued investigating the case. As part of his investigation, Pasley spoke with Shanté Rudd, and she told him about her telephone conversation with the victim on the day of the victim's death. Rudd's information was important because the appellant had claimed that he and the victim did not have an altercation that day. The appellant also had claimed that the shooting was accidental, but Pasley learned that the victim and the appellant had "at best a stormy relationship" and that the relationship had a history of domestic violence. Pasley said the events "didn't seem to match the story he was telling us." Pasley sent the victim's shirt, a firearm, a spent shell casing, and the bullet recovered from the

victim to the Tennessee Bureau of Investigation (TBI).

On cross-examination, Pasley testified that he never went to the scene of the shooting but that he viewed all the evidence. He acknowledged that he released the appellant from the 48-hour hold because he did not have enough evidence to charge the appellant with a crime. The appellant claimed that he and the victim did not fight on the afternoon of January 13, but Rudd heard "the beginnings of an altercation" between them. Pasley investigated the appellant's prior criminal history and found "[n]othing of significance." He also investigated the victim's employment at Imperial Security and learned she had been fired for "inappropriate conduct," including the use of profanity. At some point during the victim's employment, the appellant had been escorted from the premises.

On redirect examination, Pasley testified that the appellant claimed the pistol accidentally fired while he was trying to show the victim how to put on the safety catch. However, someone told Pasley that the victim had been in the military and did not need the appellant to show her how to use firearms.

Laura Hodge, a special agent forensic scientist with the TBI Crime Laboratory, testified as an expert in gunshot residue analysis that she received gunshot residue kits from the victim, the appellant, and Chris Martin. The victim's results were inconclusive, and the appellant's and Chris Martin's results showed that elements of gunshot residue were absent. Agent Hodge noted that in order for her to classify a residue test as positive, three certain elements had to present but that some manufacturers of .22-caliber ammunition did not use all three elements. Therefore, the results of the three residue tests in this case did not eliminate the possibility that the victim, the appellant, or Chris Martin fired the gun, handled the gun, or were near it when it fired.

Agent Steve Scott of the TBI Crime Laboratory testified as an expert in firearms identification and recording analysis that he received a gun magazine containing six live .22-caliber cartridges; two live .22-caliber cartridges that were in the same package as the magazine but were not in the magazine itself; one spent .22-caliber shell casing; the bullet recovered from the victim; and the firearm involved in the shooting. Agent Scott tested the gun and found it to be "in normal operating condition with the safety features functioning." He said that in order for the unloaded gun to have been fired, the slide had to be pulled back and moved forward in order for the top cartridge in the magazine to move into the chamber of the pistol. Then the safety catch had to be moved "so that the red dot shows," meaning the gun was in the "fired position." Finally, a person had to pull the trigger. The gun would have fired the bullet and ejected the fired shell casing. Agent Scott explained that if a person did not know that a cartridge was already loaded in the chamber and "cycle[d] the slide," the unfired cartridge would be ejected and the next cartridge in the magazine would be loaded

into the weapon.

Agent Scott testified that he test-fired four cartridges and compared the markings on the bullets and ejected shell casings to the spent shell casing found at the crime scene and the bullet recovered from the victim. The markings showed that the bullet recovered from the victim was fired from the gun. Agent Scott examined the victim's shirt and found one bullet hole in the upper left chest or shoulder area. He did not observe any gun powder residue with the naked eye. However, when he looked at the shirt under a microscope, he found what appeared to be some gun powder particles. Chemical testing showed slight lead residues around the bullet hole. Agent Scott produced test patterns by firing the gun at different distances and compared those patterns to the pattern on the victim's shirt. He concluded that the pattern on the shirt was created by the muzzle of the gun being more than three feet but less than four feet from the shirt when the gun was fired.

On cross-examination, Agent Scott testified that the residues he looked for were "totally different" from the residues Agent Hodge looked for. He received eight live cartridges: six were in the magazine, and two were separate from the magazine. If the bullet recovered from the victim came from the spent shell casing found on the living room floor, then that would have meant there were a total of nine cartridges. The magazine had a capacity of eight cartridges, and one cartridge could have been in the chamber, so the gun could have held a total of nine cartridges. He acknowledged that the gun could have been loaded to capacity and ready to fire without pulling back the slide.

Amy R. McMaster, the Davidson County Chief Medical Examiner, testified as an expert in forensic pathology that she prepared the victim's autopsy report. A bullet entered the left side of the victim's chest and traveled front to back, left to right, and slightly downward. The bullet fractured the victim's second left rib; traveled through her left lung and aorta, a major blood vessel; and came to rest in her spine. The victim tested negative for alcohol and drugs. Dr. McMaster said that the victim's cause of death was a gunshot wound to the torso and that the manner of death was homicide. On cross-examination, Dr. McMaster testified that "homicide" simply meant the victim died at the hands of another person. At the conclusion of Dr. McMaster's testimony, the State rested its case.

The then twenty-nine-year-old appellant testified that he grew up in Batesville, Mississippi, and met the victim when he was eight years old. They went to school together and dated about three years in high school, but the appellant never visited her home. In 2000, the appellant entered the Navy. His specialty was hospital corpsman, and he received emergency medicine training. In 2005, the appellant was honorably discharged from the military. During a trip the Batesville, he reconnected with the victim, and they began dating. The victim moved in with him in Memphis in August 2005. He said that she was a loving

and caring person but that she was blunt and stubborn. He stated that he and the victim argued a lot because he also was stubborn but that they got along "pretty decent" and never fought physically. Both of them used profanity during their arguments.

Regarding the April 15, 2006 incident, the appellant testified as follows: He and his brother returned to the apartment from the gym about 1:00 p.m. and discovered that the apartment's side window had been shattered. The appellant asked the victim about the window, and she told him that while he was gone, she had returned to the apartment and been unable to get inside. The victim claimed that she thought the appellant had the door locked, that she tapped on the apartment's glass window to get his attention, and that the glass shattered. The appellant removed the lock from the apartment door and took it to the maintenance office. The employees in maintenance told him to report the broken window to the police. The victim overheard the conversation and stated, "[D]on't call the police on me." When the appellant later returned to the apartment, he discovered that the driver's side window of his car had been broken and that the victim was gone. He telephoned the police and reported the broken car window, and the police told him to stay by his car. The appellant did not want to press charges against the victim for breaking the windows, but he telephoned James Bownes to talk about the victim. Bownes told the appellant that he was on his way to Memphis. The appellant met Bownes and Tamu Leland at a gas station, and they followed him back to the apartment. When they arrived, the victim was outside and talking with two police officers. The officers asked the appellant if he wanted to press charges, and the appellant said no. The victim left with her family. After five days, she telephoned him and told him that she was ready to come home. The appellant said that he did not break the car window, that he did not chase the victim with a hammer, and that he did not see any cuts or bruises on her.

Regarding the disturbance at Imperial Security, the appellant testified as follows: The victim began working at Imperial Security in May 2006, and the appellant occasionally visited the victim at work in order to exchange cars with her. One day, the appellant and the victim had "a little argument on the phone." The appellant drove to Imperial Security to exchange cars with the victim, and she began "fussing" at him for not leaving gas in the car. The victim went into her office, got the car keys, and threw them at the appellant. He went to the car to leave, but the victim told him to come back and told him to take his "stuff" out of one car and put it in the other car. The appellant walked into the building to get the car keys from the victim. Charles Woods told him that "we can't have this up here" and walked the appellant outside. The appellant said he "might have tapped on the glass a couple of times" but that he was not "beating" on the glass. The appellant denied threatening Woods and said, "I just told him don't put his hands on me." The appellant said he did not know that the victim was planning to move out of their apartment or stay with Tracie Price.

-11-

The appellant testified that January 13, 2007, a Saturday, started as a "normal day." He and the victim went to a Sonic Drive-In, then a pet store, and finally the bank. They got home about 4:00 or 5:00 p.m., and the appellant's brother was asleep on the couch. After dinner, the appellant used the computer in his brother's bedroom, and the victim watched television in the master bedroom. The victim was on the telephone, but the appellant did not know to whom she was speaking. Earlier that day, the appellant and the victim had a "usual argument," but the appellant did not remember what it was about. After the appellant finished using the computer, he went into the bedroom and watched television with the victim. He and the victim were having oral sex when they heard the apartment's front door hit the fireplace. The victim wanted to "check it out," so the appellant grabbed his gun from underneath the bed. The appellant opened the bedroom door and saw his dog standing in the hallway, "looking dead at the [front] door." The appellant and the victim walked in the hallway toward the living room. The appellant said that no lights were on in the living room, that he "made the weapon ready" by pulling back the slide, and that he noticed the safety catch was off. When he and the victim got into the living room, the appellant stopped by the telephone while the victim looked out the kitchen window to see if anyone was outside. The front door was wide open, and the appellant picked up the telephone with his left hand in case he had to call 911. He was holding the pistol in his right hand. As the appellant tried to put on the gun's safety catch, his left hand hit the trigger, and the gun fired. The victim was standing about five feet away, and the appellant asked if she was okay. The victim did not say anything and dropped to her knees. The appellant dropped the pistol, went to the victim, and called 911. He put pressure on her wound and gave her "rescue breaths."

The appellant testified that he was devastated by the victim's death and was still devastated at the time of trial. He spent three days in jail after the shooting but was released with no restrictions on his movement and eventually moved to Seattle, Washington. He later learned from his mother about a warrant for his arrest and immediately turned himself in to U.S. Marshals in Seattle.

On cross-examination, the appellant testified that the victim's key for the apartment door would not work on April 15, 2006, because the deadbolt kept jamming. At first, the appellant said that he and his brother had gone to the gym and that he did not know how the deadbolt got locked. However, he then stated that he left the apartment first and that he assumed his brother locked the deadbolt. The appellant acknowledged that glass was broken out of the car window but said that the broken window was not his fault. Regarding the incident at Imperial Security, the appellant said that Charles Woods was acting appropriately when Woods asked him to leave because he and the victim were arguing. However, the appellant did not threaten the victim.

The appellant testified that the victim had a cellular telephone and that she may have

talked to Shanté Rudd while he and the victim were at the pet store. The State asked the appellant why he did not mention the victim's conversation with Rudd during his direct testimony, and he answered, "I didn't know that was a detail that was needed." The victim was fully clothed and performing oral sex on the appellant when they heard the front door hit the fireplace. The appellant pulled up his pants, and he and the victim walked down the hallway at the same time. He had the gun pointed at the door and was holding the telephone when he tried to push down the gun's safety catch. The State had the appellant demonstrate his actions for the jury. The appellant denied that he locked the victim out of the apartment or that she was banging on the door to get back inside just before the shooting. He acknowledged that no one was seen breaking into the apartment, that nothing was taken from the apartment, and that his brother slept through the noises from the door and the gunshot. He also acknowledged that in a prior hearing, he testified that he had "already put 911 into the phone" when he shot the victim. However, he had not yet pressed "send." He explained that he had dialed 9-1-1 in case someone was breaking into the apartment. The appellant did not telephone Tracie Price after the shooting; he telephoned the Imperial Security office phone. He acknowledged that he used to work at 40 Cal Records and went by the name "Tricksta." He also acknowledged that during the time the victim was employed, he was unemployed.

At the conclusion of the appellant's testimony, the jury convicted him as charged of second degree murder. After a sentencing hearing, the trial court sentenced him to twenty years to be served at 100%.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the conviction because he was the only person able to give direct evidence about the shooting, and he told the police and testified at trial that the gun discharged accidentally. He notes that the police found an unfired cartridge on the floor, which was consistent with his testimony that he "charged" the weapon prior to the shooting. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage,

-13-

571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-106(a)(20). Tennessee Code Annotated section 39-11-301(a)(2) provides, "When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally." A person "acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." Tenn. Code Ann. § 39-11-302(a).

Initially, we note that the appellant failed to include the trial exhibits in the record on appeal. The exhibits included photographs of the crime scene, photographs of the victim's injuries after the hammer incident, and Tracie Price's recording of the appellant's telephone call to her after the victim's death. Nevertheless, we have determined that the record is adequate for appellate review of the sufficiency of the evidence. See State v. Caudle, 388 S.W.3d 273, 279 (Tenn. 2012).

Taken in the light most favorable to the State, the evidence shows that about 3:30 p.m. on January 13, 2007, the victim and the appellant argued about the victim's prior relationship with another man. Shanté Rudd heard the appellant and the victim curse at each other, and the victim told Rudd that she was going to "handle" the appellant. About 6:30 p.m., the

-14-

appellant shot the victim. Although the appellant claimed that the victim was performing oral sex on him when they heard the apartment door open, the victim was shot in the living room fully clothed, even wearing her socks and shoes. Moreover, Mrs. Farmer's testimony that she heard the gunshot "right after" the banging and kicking does not comport with the appellant's testimony that after he and the victim heard the door hit the fireplace, he pulled up his pants, got his gun from underneath the bed, followed the victim out of the bedroom, walked down the hallway with her, and dialed 9-1-1 before the gun accidentally discharged. We note that the appellant told Officer James Fitzpatrick that he and the victim were in the living room about twenty seconds before the shooting. While the evidence of whether the appellant knowingly killed the victim is circumstantial, evidence is sufficient to sustain his conviction beyond a reasonable doubt.

## B. Rule 404(b)

The appellant claims that the trial court erred by allowing witnesses to testify about the incident that occurred in April 2006, regarding the broken car window, and the incident that occurred in October 2006, regarding the disturbance at Imperial Security. The appellant contends that the testimony was inadmissible propensity evidence under Tennessee Rule of Evidence 404(b) and that, even if the evidence was admissible, the State should not have been allowed to present the evidence during its case-in-chief. The State argues that the trial court properly admitted the evidence. We agree with the State.

Before trial, the State filed a motion to introduce evidence of the appellant's prior threats and acts of violence against the victim in order to prove his intent, prove his motive, and "show the context of the murder." The appellant filed a response to the motion, arguing that the evidence was inadmissible propensity evidence and hearsay. At a pretrial hearing on the motion, the prosecutor advised the court that she was seeking to introduce evidence of two events: the April 2006 incident in which the appellant allegedly tried to hit the victim with a hammer and the Fall 2006 incident at Imperial Security.

Tamu Leland testified during the hearing that she did not talk with the victim on April 15, 2006. However, one day in April, Leland's father received a telephone call from the victim's friend, telling him that the victim wanted her family to pick her up. Leland and her father went to Memphis. When they arrived at the victim's apartment, the victim was standing outside, and two police officers were standing next to her. Leland said the victim was "shaky," was "flush red," and had "a blank stare." Leland said that she knew the victim was upset and that she went to the victim, grabbed her hand, and told her to calm down. The victim was shaking and told Leland that she was sitting in the car when the appellant hit the driver's side window with a hammer. Leland saw the window's shattered glass. The victim left with Leland and their father, and Leland saw glass in the victim's hair. Leland also

noticed that the victim had a scratch or "a little cut" on her chest. When the victim raised her arm to pick out the glass, Leland saw another small scratch and some blood on her arm.

Sergeant John Goad testified that on April 15, 2006, he was working in the police station and took a report from the victim for a "simple assault." Another officer took pictures of the victim's arm and back. Sergeant Goad identified photographs taken that day. He said that one of the photographs showed injuries to the victim's chest "[due] to a fight that happened on the day before, the 14th," that another photograph showed "some marks on the back, scratches made on 4/15, the day of the incident, . . . due to glass breaking," and that a third photograph showed "marks on her arm, bruises to the right arm due to the suspect having grabbed the victim by the arm." According to his report, the victim stated that the person responsible for her injuries was the appellant.

Tracie Price testified that she worked in the Imperial Security office with the victim. One day in October 2006, the appellant and the victim "had an argument so he came up to the job." The appellant entered the building and "was banging on the window," and the victim was afraid. Price said that she was in her boss's office and that the victim ran to the office and wanted someone to escort the appellant off the property. Price stated that the victim was nervous and crying and that the victim said the appellant was going to beat her up. Price heard the appellant tell the victim, "[B]itch, bring your ass out here. I need to talk to you. The discussion we had over the phone is not over with, we need to talk." The appellant's voice was loud and angry. Price had heard telephone conversations between the appellant and the victim previously when the victim would "put the phone on loud speaker." The day after the victim's death, the appellant telephoned Price to explain his side of the story. Price said she recorded the conversation in which the appellant "basically [told] me it was an accident."

Charles Woods testified that he worked with the victim at Imperial Security and that during the disturbance, the appellant "was beating on there and trying to get her attention, trying to get her to come out of that glass enclosure." Woods asked the appellant to leave. The appellant was angry but went outside, got into his car, and "sped off." Woods stated that the appellant said some things "in a threatening manner . . . because he was mad because he couldn't get to Martha."

The State argued that both incidents showed the appellant's intent to harm the victim, his lack of mistake or accident, and the "nature of the relationship." The trial court found clear and convincing evidence of both incidents. The trial court also found that both incidents were relevant to show the nature of the relationship, the appellant's hostility and malice toward the victim, and his intent to harm her. The trial court ruled that because the appellant was going to claim that the shooting was an accident, the probative value of the

evidence was "extremely, extremely probative to rebut that." The trial court held that the witnesses' testimony was admissible.[1]

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). "In other words, a party may not use character evidence to show that a person acted in a particular way because he or she had a propensity to do so." State v. Kiser, 284 S.W.3d 227, 288 (Tenn. 2009). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b).

However, such evidence may be admitted for other purposes if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). "Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses." Kiser, 284 S.W.3d at 288 (citing Tenn. R. Evid. 404(b), Advisory Comm'n Cmts, and State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985)). Admissibility of other crimes, wrongs, or acts is also contingent upon the trial court finding by clear and convincing evidence that the prior crime, wrong, or act was actually committed. Tenn. R. Evid. 404(b); Wyrick, 62 S.W.3d at 771. The jury may consider evidence admitted under 404(b) as substantive evidence at trial. Wyrick, 62 S.W.3d at 771.

Before the trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling,

---

[1]The record reflects that the State originally tried the appellant for first degree murder and that the trial ended in a mistrial. After the trial court announced that the evidence was admissible under Rule 404(b), Tennessee Rules of Evidence, defense counsel asked that the record reflect that "we are here in a retrial and not a new trial" and that "[t]his same issue with the same witnesses and circumstances was presented in the trial before." Defense counsel advised the trial court that the previous judge had ruled that the evidence was inadmissible under Rule 404(b) and requested that a transcript of that prior hearing be made a part of the record for identification purposes only "so it would be readily available before the Court in the event it becomes an issue later on." The trial court refused.

and the reasons for admitting the evidence;

>    (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

>    (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Provided that the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). "However, in view of the strict procedural requirements of Rule 404(b), the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." Id.

Regarding a defendant's prior threats of violence against a victim, this court has stated as follows:

> Tennessee courts have accepted the use of evidence of a homicide defendant's threats or prior violent acts directed toward the homicide victim as a means of allowing the State the opportunity to establish intent. See State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993); see also State v. Turnbill, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982). The courts theorize that such evidence is probative of the defendant's mens rea at the time of the homicide because it reveals a "settled purpose" to harm the victim. Smith, 868 S.W.2d at 574. Specifically, our supreme court has ruled that "[v]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." Id.

> The defendant argues that the only purpose for introducing evidence of his assaults against the victim was to show a propensity for harming the victim. We agree with the defendant that evidence is admissible pursuant to Rule 404(b) only when it is probative of a material issue at trial. See generally Bunch v. State, 605 S.W.2d 227, 229-32 (Tenn. 1980). Here, the defendant was indicted for first degree premeditated

-18-

murder, and the State's theory was that the murder was accomplished by driving the victim to a remote location, assaulting her with a blunt object, and then later moving her body to another location. The State was obliged to prove that the killing of the victim was "premeditated and intentional." See [Tenn. Code Ann.] § 39-13-202(a)(1) (1982). In our view, evidence of the defendant's prior assaults of the victim fits squarely within the Smith rule. The evidence established the violent nature of their relationship and the defendant's hostility toward the victim.

State v. Gilley, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008).

We conclude that evidence of the appellant's prior violent behavior toward the victim was probative of his intent. We note that the appellant was charged only with second degree murder, which is a knowing killing. However, a finding that a defendant acted intentionally necessarily establishes that the defendant acted knowingly. See Tenn. Code Ann. § 39-11-301(a)(2). Therefore, the State could use the prior bad act evidence to prove that the appellant acted intentionally on January 13.

The appellant contends that even if the evidence was admissible, the State should not have been allowed to present the evidence during its case-in-chief because the State could offer the proof only in rebuttal to rebut his claim of accident. We disagree with the appellant. Prior acts evidence is appropriate to rebut a claim of mistake or accident if such a claim is asserted as a defense. State v. McCary, 922 S.W.2d 511, 514 (Tenn. 1996). In this case, the appellant never disputed that he shot the victim and claimed immediately after the shooting that he did so accidentally. Although the appellant has failed to include the opening statements in the appellate record, the State repeatedly advised the trial court during the pretrial hearing that the appellant was going to argue at trial that he shot the victim accidentally, and defense counsel never stated otherwise. Moreover, during his cross-examination of former MPD Officer James Fitzpatrick, defense counsel tried to show that the police did not have enough evidence to disprove the appellant's claim that he accidentally shot the victim. Clearly, mistake or accident was always the crux of the appellant's case. Therefore, the trial court properly allowed the evidence during the State's case-in-chief to rebut that claim.

C. Hearsay

Finally, the appellant claims that the trial court erred by allowing Tamu Leland and Sergeant Goad to testify about hearsay statements the victim made to them regarding the

appellant's trying to hit her with the hammer. He contends that the statements were not admissible under the excited utterance exception to the hearsay rule because the victim was no longer under the stress of the incident when she made the statements. The State contends that the trial court properly allowed the statements under the excited utterance exception. We conclude that the trial court erred by allowing Sergeant Goad to testify about the victim's statements but that the error was harmless.

During the pretrial hearing discussed in the previous section, the trial court ruled that the victim's statements to Tamu Leland and Sergeant Goad in April 2006 were excited utterances because she made them "under the stress of the event." The trial court noted that although the hammer incident apparently occurred on April 14, 2006, and that the victim "may have calmed down by that time," the victim's statements to Sergeant Goad on April 15 were excited utterances because "she's still relating the startling events that transpired on 4/14/06 to the officer."

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802. One of those exceptions is for excited utterances. A statement is considered an excited utterance if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2); see also State v. Gordon, 952 S.W.2d 817, 819 (Tenn. 1997). In order for a statement to qualify as an excited utterance, (1) there must be a startling event or condition; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant is under the stress or excitement from the event or condition. Gordon, 952 S.W.2d at 820. The startling event is typically the act underlying the legal proceedings, for example an assault or accident; however, "a subsequent startling event or condition which is related to the prior event can produce an excited utterance." Id. "The ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993).

The time interval between the startling event and the statement is only one consideration in determining whether the statement was made under stress or excitement. "'Other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress.'" Gordon, 952 S.W.2d at 820

(quoting Neil P. Cohen et al., Tennessee Law of Evidence, § 803(2).2 at 534 (3d ed. 1995)). Our supreme court has stated that generally, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." Pylant v. State, 263 S.W.3d 854, 870 (Tenn. 2008).

Obviously, the appellant's hitting the car window with the hammer was a startling event. Leland arrived at the apartment complex relatively soon after the window was broken and testified that the victim was flushed red, shaking, and upset. Leland told the victim to calm down, and the victim told Leland that she was sitting in the car when the appellant hit the driver's side window with a hammer. Under those circumstances, we cannot say that the trial court abused its discretion by concluding that the victim's statement qualified as an excited utterance.

Regarding the victim's statements to Sergeant Goad, we initially note that the appellant contends that the victim made her statements to the officer the day after the hammer incident. The trial court also found that the victim reported the hammer incident to Sergeant Goad the day after it occurred. However, in our view, the timing of the incident in relation to the victim's statements to the officer is unclear. Sergeant Goad testified that the victim came into the police department on January 15 and reported a simple assault. While Sergeant Goad testified at the pretrial hearing about a photograph showing injuries to the victim "[due] to a fight that happened on the day before, the 14th," he also testified about a photograph showing "some marks on the back, scratches made on 4/15, the day of the incident, . . . due to glass breaking." Moreover, Tamu Leland testified that after the hammer incident, the victim returned with her and their father to Batesville and remained there for five days.

In any event, the theory underlying the excited utterance exception is that "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." State v. Land, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000). In other words, the heart of the excited utterance exception is spontaneity. Smith, 857 S.W.2d at 9. In the instant case, the victim did not make her statements to Sergeant Goad spontaneously. Furthermore, Sergeant Goad offered no testimony at the hearing or at trial about the victim's appearance or behavior to suggest that she made the statements while she was still under the stress of the event. As the trial court even noted, the victim "may have calmed down by that time." Therefore, we conclude that the victim's statements to Sergeant Goad did not qualify as excited utterances.

We must now determine the effect of the error. The error at issue is a non-structural constitutional error; accordingly, the test to determine whether the error is harmless is

whether it appears "beyond a reasonable doubt that the error complained of 'did not contribute to the verdict obtained.'" State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013) (quoting State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)).

Due to the trial court's error, the jury heard statements made by the victim about physical injuries caused by the appellant. The court's error also resulted in the State's introducing three photographs through Sergeant Goad showing those injuries. However, the evidence against the appellant for second degree murder was strong. Shanté Rudd heard the appellant and the victim arguing just three hours before the shooting while the appellant told Sergeant Fitzpatrick that he and the victim did not argue that day. Moreover, the live round on the floor, the victim's being fully clothed, the deep bite mark on the appellant's shoulder, and Mrs. Farmer's testimony about hearing the shot "right after" the banging/kicking noises were inconsistent with the appellant's statement to Sergeant Fitzpatrick about the shooting. The evidence established that the appellant and the victim had an extremely stormy relationship and that the appellant had tried to harm the victim previously when he was angry with her. The evidence also established that the appellant was possessive of the victim and that she was planning to move out of their apartment. Therefore, we conclude that the trial court's error was harmless.

### III. Conclusion

Based upon the record and the parties' briefs, we conclude that the trial court erred by allowing Sergeant Goad to testify about the victim's hearsay statements but that the error was harmless. Therefore, we affirm the appellant's conviction.

_____
NORMA McGEE OGLE, JUDGE